IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 13–cv–02430–RM–KMT

LEPRINO FOODS COMPANY,

    Plaintiff,

v.

DCI, INC.,

    Defendant.

---

## ORDER

---

This matter is before the court on "Defendant's Motion for Protective Order and to Quash Plaintiff's Subpeonas Duces Tecum" [Doc. No. 23] ("Mot."), filed March 31, 2014. "Plaintiff's Response to Defendant's Motion for Protective Order and to Quash Plaintiff's Subpoenas Duces Tecum" [Doc. No. 30] ("Resp.") was filed on April 21, 2014 and Defendant's Reply [Doc. No. 42] ("Reply") was filed on May 5, 2014. The court heard oral argument on May 14, 2014. The motion is ripe for review and ruling.

Plaintiff Leprino Foods Company ("Leprino") and Defendant DCI, Inc. had done business with one another for approximately thirty years prior to the filing of this case. (Compl. [Doc. No. 1] at ¶ 7.) Pursuant to Agreements signed in 2001 and 2007, Leprino purchased 26 stainless steel tanks from DCI. (*Id.* at ¶¶ 8, 11.) Plaintiff alleges that these tanks were damaged, in part, by

stress corrosion cracking first noticed in or about May, 2012. (Mot. at ¶ 1; Resp. at 2.) On or about June 25, 2012, Leprino hired expert Larry Mott of the GES Tech Group and, in August 2012, Leprino hired expert John Schwartzberg of Rocky Mountain EMTEC, Inc., both to conduct further investigation into the cause of the tanks' alleged failures.

Given their long-standing business relationship, DCI and Leprino agreed to a joint inspection, which included inspection and certain destructive testing of the tanks, which occurred September 26-28, 2012. (Resp. at 3; Mot at ¶ 6.) Defendant retained Material Selection Resources, Inc. ("MSR"), with whom it had previously worked on unrelated matters, and Stress Engineering Services, Inc. ("SES") as experts to assist them in this process. (Mot. at ¶ 5.) The parties agreed to exchange the reports of their respective experts in an attempt to resolve the tank issues without litigation. (Resp. at 3.)

On August 10, 2012, Leprino's expert, Larry Mott, issued his report. (Resp. at 2.) On October 18, 2012, DCI's expert MSR issued a report and, at some later time, a PowerPoint presentation based upon that report was compiled.[1] (Reply at 4.) MSR issued a further report on November 27, 2012 and DCI's second expert, SES, issued a report on December 3, 2012. (*Id.*)

The parties agreed to a meeting on February 13, 2013, to share all the information they had acquired from the experts and to attempt to mediate a "joint solution" to Leprino's claim that the tanks were defective. (See Mot., Ex. C.) Prior to the February 13th meeting, the parties agreed that their "working sessions" would be "off the record" and agreed to a written provision that all

---

[1] A hard copy of the PowerPoint slide presentation was disclosed as part of DCI's initial disclosures and has been referred to by the Plaintiff as an "undated MSR report." (Mot. at 5; Reply at 4.)

the communications and materials exchanged would be considered "confidential settlement communications." (*Id*.) No attorneys for either side were invited to the February meeting nor did any attend.

The Confidentiality Agreement entered into by the parties provides

> This will confirm that **Leprino Foods Company and DCI, Inc.,** including their respective directors, officers, employees, agents and representatives (the "parties"), agree that they will meet and confer for the purpose of attempting to resolve their dispute, and that all communications and materials of whatever kind or nature exchanged between the parties as part of that process shall constitute **confidential settlement communications** subject to Colorado Rule of Evidence 408.[2] The parties further agree that all such communications, proposals exchanged, offers, or settlement discussions shall not be subject to discovery nor be admissible as evidence for the purpose of proving liability for or invalidity of any related claim.

(Resp., Ex. 1)(footnote added).

With the benefit of hindsight it has become apparent that, in spite of the agreement of the parties, not all the reports generated as part of the settlement attempt were exchanged. The August 10, 2012 Mott report was shared between the parties and the PowerPoint presentation prepared by MSR was viewed by all, although it appears that a hard copy of the slides was not printed or provided to attendees at the February 2013 meeting. MSR's October 18, 2012 report,

---

[2] Colo. R. Evid. 408 provides:
> (a) Prohibited uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction: (1) furnishing or offering or promising to furnish accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise the claim; and (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

Mott's November 11, 2012 report, and Schwartzberg's November 12, 2012 report were exchanged pursuant to the confidentiality agreement. (Resp. at 3.) Portions of SES's December 3, 2012 report and portions of MSR's November 27, 2012 report were "included in the presentation that DCI made to Plaintiff" at the February 2013 meeting. (Reply at 4). The court interprets this phrase to mean that DCI quoted from or referred to the November 27, 2012 MSR report, the December 3, 2012 SES report, and the opinions and data compilations therein during settlement negotiations, but that the full reports themselves were not produced at that time.[3] In fact, Leprino asserts that the only defense expert report they received in full prior to the production of initial disclosures after litigation was commenced was the October 18, 2012 MSR report.[4] (Resp. at 5.)

Unfortunately, the parties were unable to come to a definitive agreement about the tanks at or after the February meeting. Leprino alleges that, "On or about February 22, 2013, DCI informed Leprino Foods that it would not honor any of its warranties, guarantees and representations under the Agreements [for DCI to supply the tanks to Leprino]." (Compl. at ¶ 16.) At the May 14, 2014 court hearing held on this motion, Leprino's counsel stated that he had been hired to represent Leprino in connection with the alleged defective tanks matter shortly after the February 13, 2013 meeting failed to resolve the issues amicably.[5]

---

[3] The complete reports were supplied to Leprino through DCI's initial disclosures.

[4] DCI itself prepared two reports in connection with the meeting; however the existence of these reports is not particularly relevant to the issues present in this motion and it appears that, while DCI may have used their own reports at the February 13, 2013 meeting, the DCI reports were not shared in full with Leprino at the time of the meeting. (*Id.*)

[5] To date no transcript of the proceedings on May 14, 2014 has been docketed. The court, however, has reviewed the recording of the proceedings and therefore extracts from the statements and arguments of counsel where appropriate.

In May of 2013, with litigation clearly looming, Leprino decided to have its expert, Mr. Schwartzberg, perform further destructive testing on the tanks.  (*See supra.*, n.5.*)*  DCI and its experts were invited to attend and observe and Plaintiff provided DCI with a copy of Schwartzberg's testing results.  (*Id.*)  On May 24, 2013, SES prepared another report for DCI.  (Reply at 4.)  Defendant asserts that the May 24, 2013 SES report "reflects work done in response to the mutual presentations given by both DCI and Plaintiff."  (*Id.*)  Timing of the report suggests that the May 24, 2013 SES report was generated as a result of SES's observations of the May 2013 destructive testing undertaken by Plaintiff's expert.  Whether the parties were still actively pursuing settlement in May 2013 and still operating under the Confidentiality Agreement is disputed.  What is not disputed is that the May 24, 2013 SES report was not provided to Plaintiff.

This case was filed on September 6, 2013 and initial disclosures were made by DCI on or about December 3, 2013.  As part of the parties' Fed. R. Civ. P. 26(f) conference, DCI advised counsel for Leprino that DCI "believe[s] the experts for Leprino and DCI involved in the pre-suit investigation, and the documents they generated and exchanged, need to be disclosed under Rule 26.  We plan to list them in Sections 1 and 2 of DCI's disclosures."  (Resp., Ex. 2.)  Exhibit 3 to the Response indicates that DCI listed both the experts themselves in Section 1, "Individuals Likely to have Discoverable Information" and also listed the reports at issue herein as well as the reports generated by Leprino's experts in Section 2, "Listing, Description, and Location of

5

Documents, Data Compilations and Tangible Things," at ¶¶ 38 - 44 and 48[6] - 51, as promised. (Resp. Ex. 3)

Upon receiving DCI's initial disclosures, Leprino advised counsel for DCI that they had not previously received many of the reports which DCI had provided in its disclosures. DCI confirmed that it did not require the return of the previously undisclosed reports and advised Leprino it was free to share the reports with its own experts. (Resp., Ex. 4.)

Leprino has now issued broad records subpoenas to both MSR and SES. DCI seeks to quash the subpoenas on the basis that neither party has yet identified experts who will testify at trial and that discovery from a consulting expert for an opposing party is forbidden by Fed. R. Civ. P. 26(b)(4)(D). Further, DCI argues against a finding of waiver of either the consulting expert discovery protection or work-product privilege concerning materials prepared in anticipation of litigation as a result of its disclosures based primarily on the fairness doctrine embodied in Fed. R. Evid. 502 and 106. DCI argues that even if waiver was found, any waiver would extend only to the disclosed reports themselves and would not permit document production from the consulting experts pursuant to the broad parameters of the subpoenas issued by Plaintiff. Additionally, DCI cites to the parties' pre-litigation confidentiality agreement as barring the Plaintiff from discovery based on the settlement negotiations and documents produced thereunder.

---

[6] The court infers that #48 "PN2201071 Report 2 Rev. 2 from SES, bates nos. 0774-0821" is the May 24, 2013 SES report.

*LEGAL STANDARDS*

"Federal Rule of Civil Procedure 26(b)(1) provides for access to all information 'relevant to the subject matter involved in the pending action' unless the information is privileged. If a privilege exists, information may be withheld, even if relevant to the lawsuit and essential to the establishment of [a] plaintiff's claim." *Baldrige v. Shapiro*, 455 U.S. 345, 360 (1982) (quoting Fed. R. Civ. P. 26(b)(1)); *see also S.E.C. v. Graystone Nash, Inc.*, 25 F.3d 187, 190-91 (3d Cir. 1994) ("The Rules of Civil Procedure recognize the need for exercise of the privilege. Rule 26(b)(5) provides that claims of privilege may be made to withhold material otherwise subject to discovery"). By excluding "privileged" information from the otherwise broad reach of pretrial discovery, Rule 26 attempts to strike a balance between conflicting interests. Privileges further the administration of justice and "should not be set aside lightly." *McNeil-PPC, Inc. v. Procter & Gamble Co.*, 138 F.R.D. 136, 138 (D. Colo. 1991); *Horton v. United States*, 204 F.R.D. 670, 672 (D. Colo. 2002). However, privileges also have the effect of withholding relevant information from the finder of fact, and for that reason should be narrowly construed. *See Montgomery v. Leftwich, Moore & Douglas*, 161 F.R.D. 224, 225 (D.D.C. 1995).

Fed. R. Civ. P. 45(d)(3)(A)(iii) requires a court to quash or modify a subpoena that: "requires disclosure of privileged or other protected matter, if no exception or waiver applies . . . ." *R&D Film 1, LLC v. Does 1-66,* Case No. 13-cv-00433-WYD-MEH, 2013 WL 4052425, at *1 (D. Colo. Aug. 1, 2013) (noting that no other grounds for quashing a subpoena are listed in the rule). Further, a court may quash a subpoena when the Rule 45 subpoena requires "(i) disclosing a trade secret or other confidential research, development, or commercial information; or (ii) disclosing

an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." Fed. R. Civ. P. 45(d)(3)(B). "A party seeking to quash a subpoena duces tecum has a particularly heavy burden as contrasted to a party seeking only limited protection." *In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.,* 669 F.2d 620, 623 (10th Cir.1982).

The work-product doctrine derives from the provisions of Fed. R. Civ. P. 26(b)(3), which provides in relevant part:

> (3) Trial Preparation: Materials
> (A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But . . . those materials may be discovered if:
> > (i) they are otherwise discoverable under Rule 26(b)(1); and
> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

*See Am. Banker's Ins. Co. of Fla. v. Colo. Flying Academy, Inc.*, 97 F.R.D. 515, 516 n.1 (D. Colo. 1983) (noting that Rule 26(b)(3) codifies the work product doctrine recognized in *Hickman v. Taylor*, 329 U.S. 495 (1947)).

The work-product doctrine is governed by a uniform federal standard, *Frontier Refining Inc. v. Gorman-Rupp Company, Inc.*, 136 F.3d 695, 702 n.10 (10th Cir. 1998), and is interpreted under both Fed. R. Civ. P. 26(b)(3) and *Hickman*. *See In re Qwest Commc'ns Intern., Inc.*, 450 F.3d 1179, 1184 n.3, 1186 (10th Cir. 2006); *United States v. Deloitte, LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010) (*Hickman* provides work-product protection for intangible work product independent of Rule 26(b)(3), which applies only to documents and tangible things). "A

document is protected by the work product privilege if it was prepared in anticipation of litigation by another party or that party's representative, and was intended to remain confidential." *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 624 (D. Colo. 1998).

## *ANALYSIS*

### *A. Standing of DCI*

Fed. R. Civ. P. 45(a)(3) provides, in part

(3) *Quashing or Modifying a Subpoena*.
   (A) *When Required*. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
. . . .
     (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; . . . .
   (B) *When Permitted*. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     (i) disclosing a trade secret or other confidential research, development, or commercial information; or
     (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

*Id*.

The court protects all persons from abuse under Rule 45 subpoena power, including the parties to the litigation and the non-party receiving the subpoena. *Broadcort Capital Corp. v. Flagler Securities, Inc.* 149 F.R.D. 626, 628 (D. Colo. 1993). "The general rule is that a party has no standing to quash a subpoena served upon a third party, except as to claims of privilege relating to the documents being sought . . . [or] upon a showing that there is a privacy interest applicable." *Windsor v. Martindale,* 175 F.R.D. 665, 668 (D. Colo. 1997). Further, an objecting party has standing to move to quash a subpoena issued to a nonparty if it "claims some personal right or

privilege with regard to the documents sought." *Carbajal v. Serra*, Case No. 10-cv-02862-REB-KLM, 2012 WL 2215677, at *2 (D. Colo. June 15, 2012) (citing 9A WRIGHT, MILLER, KANE, & MARCUS, FED. PRAC. & PROC. CIV. § 2459 (3d ed.)); *see also United States v. Gonzales,* No. 10–cr–00396–CMA, 2010 WL 3853324, at *2 (D. Colo. Sept. 8, 2010) (citation omitted) ("A party only has standing to move to quash the subpoena issued to another when the subpoena infringes upon the movant's legitimate interests.").

The burden is upon DCI as the sponsor of the motion to show that it has a privacy interest or that some other privilege applies. *Centurion Industries, Inc. v. Warren Steurer & Assoc.*, 665 F.2d 323 (10th Cir.1981). As will be addressed at length *infra*, DCI has met that burden and therefore has standing to pursue the instant motion to quash.

### B.     Pre-Meeting Expert Reports

In general, the work product doctrine can be applicable even if the documents at issue were not prepared in the course of ongoing litigation. See *S.E.C. v. Nacchio*, No. 05-cv-00480-MSK-CBS, 2007 WL 219966, at *8 (D. Colo. Jan. 25, 2007)(emphasis added); *see also Hercules Inc. v. Exxon Corp.*, 434 F. Supp. 136, 151 (D. Del. 1977) ("the fact that litigation may still be a contingency at the time the document is prepared has not been held to render the [work product] privilege inapplicable, if the prospect of litigation is identifiable because of claims that have already arisen"). This extension, however, has more verve when one party is seeking the production of a specified document which the other side has withheld as privileged now that their dispute has accelerated into litigation. That is not the factual scenario before this court.

Between the summer of 2012 up through the February 2013 meeting, the parties engaged in a course of agreed-upon conduct with the specific intent that the conduct would not be used in litigation and with a clearly expressed purpose of trying to work together to determine the cause of the tanks' failures and to craft together an acceptable remedy.  At the time the October 18, 2012 MSR Report, the PowerPoint presentation a/k/a the undated MSR Report, the November 27, 2012 MSR Report, and the December 3, 2012 SES Report were prepared, the parties were no doubt cognizant that litigation might be the end result of the alleged defects found in the products DCI had sold to Leprino.  However, the cause of the tanks' failure had not been satisfactorily determined.  The joint investigation into causation was the parties' primary objective and the reason they engaged experts during that time period.  Additionally, there was **no** expectation that the material generated by or with the experts would remain confidential to only the party who hired and paid for the particular expert.  In fact, the expressed intent of the parties was to the contrary.

During the investigative time period leading up to and including the February 13, 2013 meeting, both SES and MSR fit within the confines of "consulting experts" pursuant to Rule 26, as did Leprino's experts.[7]  Rule 26(b)(4)(D) provides

> (D) *Expert Employed Only for Trial Preparation*. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party *in anticipation of*

---

[7] Neither MSR nor SES have been disclosed as a testifying experts at trial by DCI.  In fact, the date for such disclosures has not yet arrived for either party.

11

   *litigation or to prepare for trial* and who is not expected to be called as a witness at trial.

*Id.* (emphasis added). MSR and SES were retained, at that time, for the purposes of acting as advisors to all the parties during the joint investigation of the problems plaguing the tanks and the parties' resolution of those problems, and it was hoped that none of the experts would be a witness at trial – an event which both parties were actively attempting to avoid by their joint investigation and settlement negotiations. Therefore, the court finds that, at the time of their preparation, the October 18, 2012 MSR Report, the PowerPoint presentation a/k/a the undated MSR Report, the November 27, 2012 MSR Report, and the December 3, 2012 SES Report were not subject to the work-product doctrine. However, all the reports would have been subject to the protections of Rule 26 concerning consulting experts except that, by agreement, the facts known and opinions held by the experts were being voluntarily shared.

  Additionally, the court finds that the four pre-meeting documents were subject to the provisions of the parties' negotiated and agreed upon Confidentiality Agreement even though several of them were not provided in full to Leprino prior to the initial disclosures. During the period from summer 2012 through February, 2013, the October 18, 2012 and November 27, 2012 MSR Reports, the PowerPoint presentation, and the December 3, 2012 SES Report can best be described as business documents, created by experts in their fields, to assist the parties in reaching a settlement of the defective tanks issue. Cognizant of the pitfalls inherent in utilizing experts in this manner, the parties specifically provided that should litigation concerning the defective tanks become inevitable, the reports generated by all the experts - both Leprino's and DCI's – would be considered confidential settlement communications subject to Colorado Rule of Evidence 408 and

therefore not subject to discovery in any later litigation nor admissible as evidence for the purpose of proving liability for or invalidity of any related claim. By inclusion of Rule 408 in the Agreement, the reports are further excluded for use as impeachment material in a subsequent litigation such as this one. The court finds that intrinsic to the Confidentiality Agreement is that neither party could use the reports nor the agreed upon process for joint investigation and possible resolution as a bootstrap into discovery of undisclosed privileged or otherwise protected information during litigation. The parties to this litigation are the same parties who drafted and signed the Confidentiality Agreement. The initial disclosure of the complete reports as part of discovery in this case went only to those same parties and therefore does not violate the Confidentiality Agreement. Further, the court finds that production of the complete set of pre-meeting reports is consistent with the parties' duties pursuant to Fed. R. Civ. P. 26 and to ensure completeness of the information pursuant to Fed. R. Evid. 502 and 106. Therefore, wide ranging discovery arising out of these confidential settlement documents is inappropriate by the terms of the parties' pre-litigation Agreement.

### C.    *Post-Meeting Expert Report*

The climate changed between Leprino and DCI when the February 13, 2013 meeting failed in its objective to resolve the dispute through an amicable, negotiated settlement. Parties hired, or otherwise engaged, the services of lawyers and litigation was clearly anticipated, although not necessarily a foregone conclusion. Although the parties disagree on whether there were ongoing settlement negotiations still being undertaken, the May 24, 2013 SES report clearly arose amid

13

different expectations and therefore must be treated differently from the expert reports prepared prior to the February 13, 2013 meeting.

By the time of the preparation of the May 24, 2013 report, SES's status even more clearly fits into the category of "consulting expert" pursuant to Rule 26. At that time, SES continued to assist Defendant DCI as an expert, but no longer solely as part of the joint investigation. SES now was performing its duties in clear anticipation of potential litigation. Unlike the work-product doctrine, Rule 26(b)(4)(D) does not only prohibit discovery of mental impressions, it also protects "facts known or opinions held" by a consulting expert. *Sloan Valve Co. v. Zurn Indus.,* 10 C 204, 2012 WL 5499412 (N.D. Ill. Nov. 13, 2012).

The work-product doctrine exists to "promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." *United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1298 (D.C. Cir. 1980). It is undisputed that the May 24, 2013 SES report was not produced to Leprino prior to its disclosure in discovery. Therefore, at that juncture, DCI was keeping the report confidential. The work product doctrine therefore applies to this report, as does the consulting-expert privilege. In spite of the application of both these privileges, SES's May 24, 2013 report, which had not been previously disclosed to Plaintiff, was disclosed to the Plaintiff in DCI's initial disclosures.

### D.   *Waiver by Production in Initial Disclosures*

Because the work-product privilege looks to the "vitality of the adversary system," rather than simply seeking to preserve confidentiality, it is not automatically waived by disclosure. *In re*

*Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982).   The purposes of the work-product privilege are not inconsistent with selective disclosure - even in some circumstances to an adversary.   *Id.*

In this case, no party is seeking the release of consulting expert opinions in the form of the previously drafted reports; DCI has voluntarily shared the experts' opinions both in an effort to resolve the claims without litigation, and as part of its initial disclosures in this litigation.   Leprino argues instead that the disclosure of all the previously undisclosed expert reports, both before and after the February meeting, acts as a "subject matter waiver" entitling Leprino to seek broad discovery concerning protected information not already disclosed about or derived from the documents.   (See Mot., Exs.1 and 2.)

Federal Rule of Evidence 502 governs certain waivers of privilege alleged to have occurred as a result of disclosure by the privilege-holder in federal proceedings.   In relevant part, Rule 502 provides

> (a) Disclosure made in a Federal proceeding or to a Federal office or agency; scope of a waiver. - When the disclosure is made in a Federal proceeding or to a Federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:
> (1) the waiver is intentional;
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
> (3) they ought in fairness to be considered together.
> (b) Inadvertent disclosure. -When made in a Federal proceeding or to a Federal office or agency, the disclosure does not operate as a waiver in a Federal or State proceeding if:
> (1) the disclosure is inadvertent;
> (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and

> (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(a) and (b).

There is no contention that the disclosure of the expert reports was inadvertent. Therefore, the court's analysis must focus on subsection (a) of the Rule. Waiver pursuant to Rule 502(a) is only implicated when the information previously disclosed was itself privileged. See *Iowa Pacific Holdings, LLC v. National R.R. Passenger Corp.*, Case No. 09-cv-02977-REB-KLM, 2011 WL 1527599, at *6 (D. Colo. April 21, 2011); *Silverstein v. Fed. Bureau of Prisons,* Case No. 07–cv–02471–PAB–KMT, 2009 WL 4949959, at *10–12 (D. Colo. Dec. 14, 2009). The pre-meeting reports of MSR and SES were subject to the consulting expert witness privilege and the post-meeting report of SES was subject to both the consulting expert witness privilege and the work product doctrine.

"The idea [behind enactment of 502(a)] is to limit subject matter waiver to situations in which the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials. . . ." *See* 8 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2016.2 (3rd ed. 2009 Supp.)  *See also* Fed. R. Evid. 106. As the Explanatory Note to Rule 502(a) states, the Rule creates a general presumption that a waiver is limited only to the materials actually disclosed and limits a subject matter waiver to "unusual" situations:

> The rule provides that a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either

> privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary. [citations omitted] Thus, subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner. It follows that an inadvertent disclosure of protected information can never result in a subject matter waiver. See Rule 502(b).

Fed. R. Evid. 502 explanatory n.   By requiring a fairness analysis under Rules 106 and 502(a)(3), Congress recognized that "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Eden Isle Marina, Inc. v. United States,* 89 Fed. Cl. 480, 503 (Fed. Cl. Aug. 28, 2009) (citing *Fort James Corp. v. Solo Cup. Co.,* 412 F.3d 1340, 1349–50 (Fed. Cir. 2005)).

In this case, DCI disclosed the May 24, 2013 SES expert report because it determined the subject matter was the same as the reports which were disclosed in connection with the earlier attempt to resolve the case without litigation. (Reply at 5.)   Therefore, pursuant to Rule 502(a)(3), the report "ought in fairness to be considered" with all the other reports previously exchanged, including Mr. Schwartzberg's May, 2013 report.   When the last expert report was created in May of 2013, the complaint was still four months from filing and the possibility of settlement was still contemplated, although, as previously stated, litigation was certainly anticipated.   Reports on both sides had been voluntarily shared previously under a Confidentiality Agreement, including the May 2013 report of Plaintiff's expert Mr. Schwartzberg, and the parties were well-versed on each side's arguments.

The court finds that DCI gains no tactical advantage in the litigation by virtue of full disclosure of any of the expert reports which would give rise to the "unsual" subject matter waiver sought by Plaintiff and as evidenced by the plaintiff's subpoenas on MSR and SES.   There is no selective or misleading purpose in releasing the reports, especially as to the four pre-meeting reports, which this court finds are covered in full by the Confidentiality Agreement's provision protecting "all communications and materials of whatever kind or nature exchanged between the parties as part of [the settlement] process."

Further, the court is loathe to require lawyers to nit-pick every production in discovery with 'magic words' such as 'reserving all privileges' when making disclosures as urged by Plaintiff. The parties here agreed to work together and with one another's experts to determine causation for claimed product failures and to attempt to work out a solution without wasting what could be remedial funds on expensive litigation.   They drafted and executed an agreement to protect against unwanted consequences in later litigation being attached to their open and collaborative efforts at out-of-court resolution.   For this court to find a subject matter waiver in spite of these precautions would not only violate the mandates of Rule 502 but also would discourage businesses to try to work out their differences short of litigation.   *See United States v. Telluride Co.*, 849 F. Supp. 1400, 1402 (D. Colo. 1994) ("Parties to a lawsuit may always compromise their dispute" and it is only where parties "wish to incorporate their settlement into a judicial decree" that court scrutiny is required.)   As a matter of policy, a result that discourages amicable settlement of claims short of court intervention, especially in a contract dispute with no public interests at stake, is unacceptable.

As to the post-meeting SES report, Leprino released in full the test report of its expert, Mr. Schwartzberg, in connection with the May 2013 tests.  The court finds it fair to treat the May 24, 2013 SES report in the same manner as parties are treating the Schwartzberg May 2013 report. To the extent the parties agree that one of the reports is covered by the Confidentiality Agreement, both will be so covered.  The court finds that neither report's production, either at the time of preparation by Plaintiff or as part of initial disclosures by Defendant, creates a subject matter waiver pursuant to Rule 502.

Finally, the court notes that the expert disclosure deadline in this case for affirmative experts is August 11, 2014.  Should DCI designate either MSR or SES as an expert witness to testify at trial, Plaintiff will have every opportunity to seek further discovery as appropriate.

Therefore, it is **ORDERED**

"Defendant's Motion for Protective Order and to Quash Plaintiff's Subpeonas Duces Tecum" [Doc. No. 23] is **GRANTED**.  The Subpoena for Production of Records issued to Material Selection Resources, Inc. [Doc. No. 23-1] and the Subpoena for Production of Records issued to Stress Engineering Services, Inc. [Doc. No. 23-2] are hereby **QUASHED.**

Dated this 27th day of June, 2014.'

BY THE COURT:

_Kathleen M. Tafoya_
Kathleen M. Tafoya
United States Magistrate Judge